## THE ERIE AND PACIFIC DESPATCH

*v.*

### GEORGE CECIL, JR., *et al.*

*Filed at Ottawa November 17, 1884.*

1. CONTRACT—*association of railroad companies—contract by one company, whether binding on all.* Where a combination or association of three or four different railroad companies is formed for the transportation of freight and the transaction of the business of a common carrier, which is conducted by the general managers of each of the component companies, as in the case of a partnership, so long as one of the companies acts within the general scope of its powers in making contracts or performing other acts on behalf of the association, the association itself will be bound, although the particular company acting for it has exceeded its authority, as tested by its laws or articles of association.

2. SAME—*contract with carrier for rebate on freight—of its validity.* A contract of a railway company or association of such companies, made by

its usual agents, with a shipper, to ship and carry a large quantity of grain at a reduced rate, which is five cénts on the hundred pounds less than the customary rates, but that the same should be billed at the regular rates then current and the freight paid at the latter rates, the difference in the two rates to be forthwith paid back to the shipper, is valid and binding on the company or companies making the same.

3. EVIDENCE—*question assuming fact in dispute.* It is a general rule that a question to a witness should not be so framed as to assume the existence of a material fact of which there is no proof, particularly if the fact is· a controverted one, and the person testifying is what is known as a "willing" witness. Still, a court of review will not interfere with the exercise of the discretion of the judge who tries the case in such matters, except where it is apparent the complaining party may have been injured by the ruling.

4. So, in a suit to recover a promised rebate of a part of freight paid on a shipment under a special contract, the making of which was not disputed, but where the authority of the agent and question of a ratification were in dispute, the plaintiff called his agent who made the contract for him, and asked him this preliminary question: "With whom were the contracts for the shipment of this corn made?"—which the court allowed, over the defendant's objection: *Held,* that there was no error in allowing the question in such a case.

5. SAME—*to prove authority of agent to make a contract.* Where the power of an agent to make a contract is disputed, the most convenient and natural course to pursue is, first, to establish the fact that an agreement was made, by showing its terms and the names of the parties who officiated in settling them, and then to show that those who assumed to act had the requisite authority to do so.

6. SAME—*communications between third persons—on the question of authority of agent.* On the question of the authority of a local railroad agent to make a special contract for shipping corn at reduced rates, the company, denying the agent's authority, offered in evidence several telegrams of about the date of the contract, between its general agent and another local agent, tending to show that the former agent had refused to make any reductions for others on freight between the same points: *Held,* that the telegrams were properly excluded, as having passed between persons who were strangers to the contract in question.

7. SAME—*articles of association between railroad companies—as bearing on the same question.* In a suit against an association of railway companies on a contract made by a local agent of one of the companies, the defendant offered in evidence the articles of agreement between the several companies composing the association, for the purpose of showing a want of power in the local agents to make the contract: *Held,* that they were not admissible in evidence against the plaintiff, as the public could not be bound by them, or the rules and regulations they might contain.

8. SAME—*letters between agents, as showing the terms of a contract.* A letter of an agent of a shipper, who made a special contract with an agent of a railway company in this State, for the shipment of grain, stating that fact, and that the railway agent would say what length of time would be allowed to fill certain of the cars, which was indorsed by the railway agent addressed: "Can't specify any time—the 250 cars for immediate shipment," the latter signing the same, was admitted in evidence in behalf of the plaintiff in a suit by the shipper to recover for a rebate upon freight paid, as tending to show the terms of the contract, over a general objection to its relevancy: *Held,* no error, and that the letter with the indorsement was competent to show the contract as actually made, leaving the railway agent's authority to be shown otherwise.

9. SAME—*telegrams to show ratification of contract.* To prove the ratification of a special contract made by a station agent of a railway company in this State, which company, with others, constituted an association in the nature of a partnership, it appearing that the general manager of the same company approved such contract, the plaintiff offered in evidence three telegrams between the general manager of the railway company and the general manager of the association, showing that though the first had exceeded his orders, the latter would protect him: *Held,* that the telegrams were competent evidence on that question.

10. SAME—*performance of contract made by an agent as evidence of ratification.* Where the general manager of an association of railway companies has notice of the existence and terms of a special contract for transporting grain at a reduced rate, made by an agent of one of the associated companies, and afterward furnishes cars and transports the grain, this is evidence from which a ratification of the special contract may be found.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. ROLLIN S. WILLIAMSON, Judge, presiding. ·

Messrs. WILLARD & DRIGGS, for the appellant.

Messrs. WALKER & CARTER, for the appellees.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

On the 15th of December, 1882, George Cecil, Jr., and William R. Anthony, the appellees, brought an action of assumpsit in the Superior Court of Cook county, against the appellant, the Erie and Pacific Despatch, an association of

railway companies, for an alleged breach of a special contract, whereby, it is claimed, the defendant agreed to pay the plaintiffs a special rebate on certain shipments of freight made by them over the defendant's lines of road. The cause was tried before the court and a jury, resulting in a verdict and judgment for the plaintiffs for $8644.86, which judgment, on appeal, was affirmed by the Appellate Court for that district, and the defendant, by further appeal, brings the case here for review.

The declaration charges, in substance, that the plaintiffs, on the 15th of April, 1881, through their agent, John F. Morgan, made and entered into a contract with the defendant, a common carrier and association consisting of the New York, Lake Erie and Western Railroad Company, the Cleveland, Columbus, Cincinnati and Indianapolis Railway Company, the Indianapolis and St. Louis Railroad Company, and the Illinois Midland Railway Company, whereby the defendant agreed to furnish the plaintiffs a large number of cars, to-wit, two hundred and eighty-six, for the transportation of grain from Peoria, Illinois, to Jersey City, New Jersey, and upon completion of which service and labor defendant was to receive from plaintiffs the sum of twenty-two and a half cents per hundred pounds of grain so transported, it being further agreed that the defendant was to bill said grain to plaintiffs at the regular rates then current for similar service, which said regular rates plaintiffs were thereupon to pay to defendant, and defendant then and there promised the plaintiffs, upon their payment of such regular rates to the defendant, that it, the defendant, would forthwith repay to plaintiffs the difference between the said regular rates and the said sum of twenty-two and a half cents for each one hundred pounds of grain so transported as aforesaid. The declaration then proceeds, by appropriate averments, to show a performance of the contract on the part of the plaintiffs, and a breach by the defendant, in neglecting and refusing to repay to the plaintiffs

the difference between the current rates and the contract price for the transportation of said grain, which is averred to be, in the aggregate, $8368.80.

The evidence, we think, tends to establish the material facts in the declaration, as above charged.

It is said by appellant's counsel, in the commencement of their written argument: "The only questions seriously controverted below, were, first, whether the appellant contracted or ratified a contract to repay to appellees the difference between the current rate and a rate of twenty-two and a half cents per hundred pounds, and if so, whether such contract, if made, was valid and binding on appellant. In the trial court both questions were determined in favor of appellees, and they had judgment for $8644.86. The Appellate Court having affirmed the judgment, the first of the two questions mentioned is, of course, eliminated, except so far as the same shall be found involved in the rulings of the trial court upon the admission and rejection of testimony, and the giving, refusing and modifying of instructions." This statement of counsel we accept as correct, and as showing the true *status* of the case in this court. The second question thus referred to as having been settled adversely to appellant,—namely, whether the contract, assuming it to have been made, was valid and binding on the appellant,—being one of law, is, of course, open for reconsideration in this court, and as it goes to the very foundation of the action, it will be first disposed of.

The contract in question seems to be assailed mainly on the ground that if given effect it would lead to great abuses, and place associations like the defendant completely at the mercy of its agents. We think counsel entirely over-estimate the evils and inconveniences that are likely to result from sustaining a contract of this character. Most of the objections urged against this contract would apply with equal force to all contracts made by agents within the scope of their general powers, where they have transcended mere private instruc-

tions.   To release the principal, in such cases, from respon-
sibility, would be violative of one of the fundamental rules of
the law of agency, and would seriously derange and unsettle
the present system of conducting business through the agency
of others.   It is of the utmost consequence to the community
that all servants and agents entrusted with the transaction of
business in which the public are interested should be reliable
and trustworthy, and the most effectual means of attaining
this object is to hold those who have the selecting of them,
responsible for their conduct while acting within the general
scope of their authority.

But the question we are considering is not a new one in
this court.   *Toledo, Wabash and Western Ry. Co.* v. *Elliott,*
76 Ill. 67, like the present case, was an action to recover a
rebate on freight paid by the shipper for the transportation
of a lot of corn, under a special agreement.   In that as in
this case, the contract under which the shipment was made
was assailed both on the ground it was illegal and that the
agent had no authority to make it.   In answer to these objec-
tions this court there said :   "There was certainly an apparent
authority in the local agent to contract for carrying the grain
under some special arrangement.   It seems quite certain,
from all the evidence, the corn was shipped over defendant's
road on the agreement the company would allow plaintiffs a
rebate on the usual charges, and having availed itself of the
benefits of the contract, the company ought not now to be
permitted to repudiate it on the ground their agent had no
authority to make it.   *   *   *   The contract was, to carry
the grain at the customary rates.   The rebate in the charges
was matter of private agreement between the carriers and
the shippers."   What was there said is equally applicable
here, and under the authority of that case we must hold the
agreement in this, valid and binding.

The contract in the present case was made, on behalf of
the plaintiffs, by Morgan, at Peoria, Illinois, with Nash, the

local agent of the Midland Railway Company, who assumed to act for and on behalf of the Erie and Pacific Despatch, though his authority to do so is denied by the appellant. Morgan having been introduced by plaintiffs as a witness, for the purpose of showing the agreement and circumstances under which the shipments of the grain were made, was asked this preliminary question: "With whom were the contracts for the shipment of this corn made?"—which the court permitted the witness to answer, against the specific objection of the defendant that the question assumed the existence of such contracts, without any evidence of the fact. While we recognize the general rule that a question should not be so framed as to assume the existence of a material fact of which there is no proof, particularly if the fact is a controverted one and the party testifying is what is known as a *willing* witness, yet the examination of witnesses is a matter so largely in the discretion of the judge who presides at the trial, that courts of review will not interpose except where it is apparent the complaining party may have been injured by the ruling of the trial court. Testing the case by this rule, it is manifest the ruling of the court complained of, affords no ground for reversal. That a special contract was made by Nash, on behalf of appellant, for the shipment of the grain, is not and was not a controverted question in the case. The frictional point upon which the case turned on the trial below, was whether this contract was in fact and in law the contract of appellant,—or, differently stated: first, whether Nash was authorized to make the contract on behalf of the appellant; and if not, secondly, whether appellant subsequently ratified the contract. It is clear the interrogatory complained of does not assume either the fact of Nash's authority, or the fact of appellant's subsequent ratification. The object of the inquiry was simply to disclose the particular individuals through whose agency the agreement under which the corn was shipped was effected, and we think for that purpose the

question was proper. It is conceded the grain was shipped over the appellant's lines of road in its own cars, under a bill of lading signed by Baker, its local freight agent where the shipment was made, and that it received from appellees full rates for the transportation of it, and of necessity it must have been shipped under some kind of a contract, either express or implied, and there was therefore nothing improper in so framing the question as to assume the existence of such a contract. It is clear appellant could not have been injured by it.

The contract for the shipment of the grain was made about the 18th of April, 1881. Three days later, and before the transportation of any of the grain, Morgan prepared a letter, dated the 23d, addressed to appellees at New York, their place of business, and setting forth the fact of having procured cars from the Illinois Midland Railway Company for the shipment of the grain over appellant's line of road, and the terms upon which they were obtained. On the 25th this letter was submitted to Nash for his indorsement, before enclosing it to appellees. The letter, together with Nash's indorsement thereon, was then mailed to appellees, at New York. It is as follows:

"*ILLINOIS MIDLAND RAILWAY COMPANY,*
L. GENIS, *Receiver,*
PEORIA STATION, *April 23, 1880.*

"*George Cecil, Jr. & Co., New York:*

"GENTS—I have just contracted with the Illinois Midland R. R. for the shipment of 250 cars of corn grain, from here to New York, by E. '& P. D. fast freight line, at 22 and a half cents per one hundred pounds. The other 300 cars, 100 cars by the White line, and 200 cars by the South Shore line, and we have month of April to fill. Mr. Nash will O. K. this contract, as stated, how long a length of time we have to fill the other 250 cars by the E. & P. D.

"Yours, etc.,     JOHN F. MORGAN."

"PEO., 4, 25, 1881.
*"George Cecil, Jr. & Company:*

"GENTS—Can't specify any time—the 250 cars for immediate shipment.

"Yours, truly,                    J. L. NASH."

On the trial, this letter, together with the indorsement thereon, was admitted in evidence, against the objections of the appellant, and this is assigned for error. The objection was of a general character, going only to its relevancy. While the instrument is in the form of a letter, merely, yet, when taken in connection with the indorsement of Nash, we think it was competent, for the purpose of showing the terms of the agreement as actually made between Morgan and Nash, leaving open the question of the Midland company's authority, through Nash, to bind the appellant, to be determined by such proofs as might be offered on that subject. That this was done, is abundantly shown from the record. In all cases where the power of an agent to make a contract is questioned, the most convenient and natural course to pursue, is to establish the fact that an agreement was made, by showing its terms and the names of the parties who officiated in settling them. The next step is to show that those who assumed to act, had the requisite authority to do so. Such was the order of the proofs in this case, and we perceive no objection to it.

The evidence tends to show that the contract, as made by Morgan and Nash, was approved by A. E. Schraeder, general manager of the Illinois Midland Railway Company, whose headquarters were at Terre Haute, Indiana, but that H. R. Duval, the general manager of the Erie and Pacific Despatch, did not, in the first instance, approve of it; that on being informed by Frank Baker, the local agent of appellant at Peoria, as to the character of the agreement, he sent to Schraeder the following telegram:

"NEW YORK, *April 19, 1881.*

"*A. E. Schraeder, Traffic Man., Terre Haute, Ind.:*

"Baker wires me you contracted 150 cars for E. & P. Despatch on 16th, at five cents off. My orders positively prohibit me making any concessions whatever on tariff. Will you be able to protect this? I imagine you will.

H. R. DUVAL."

—To which Schraeder, on the same day, answered as follows:

"PEORIA, ILL., *April 19, 1881.*

"*H. R. Duval, 6 Bowling Green, New York:*

"No, I can't; but I took it for granted you certainly would do as well as other managers. Your telegram frightens me. Please answer quick.

A. E. SCHRAEDER."

As a reply to this last dispatch, Duval on the next day sent to Schraeder the following:

"NEW YORK, *April 20, 1881.*

"*To A. E. Schraeder, Peoria, Illinois:*

"Of course I will have to help you out, although I am very sorry that you did it. You need not be frightened, however.

H. R. DUVAL."

This reply the court admitted in evidence against the objections of the defendant, and its ruling in this respect is assigned for error. We think the court ruled properly in admitting the evidence. One of the questions involved in the case, as stated by appellant's own counsel, was, whether, assuming Nash acted without authority in making the contract with Morgan, there was a subsequent ratification of it on the part of appellant, and we think this was competent evidence tending to establish the affirmative of that issue. It showed, conclusively, the appellant, through its general manager, prior to the performance of the contract had notice of its existence, which, taken in connection with the fact the

appellant, without any new understanding or arrangement, proceeded to furnish the cars and transport the grain as in the original contract provided, certainly tended to prove a ratification.

Several telegrams which passed between Baker and Duval, dated, respectively, the 16th, 18th and 19th of April, 1881, and tending to show that the latter, as general manager of the appellant, refused to make any reduction on current rates from Peoria to New York, were offered in evidence by appellant by way of defence, but, on appellees' objection, were excluded from the jury. We think the court ruled properly in not admitting these telegrams in evidence. The appellees are not connected with them, and they are mere communications between strangers, and we are aware of no principle upon which appellees should be bound or injuriously affected by them.

Other evidence of a similar character was offered in defence, and, on objection, ruled out by the court, and, for the reasons just stated, we think properly. Of this class of evidence offered and rejected, were the articles of agreement between the companies constituting the Erie and Pacific Despatch. These articles were offered in evidence for the purpose of showing that neither Nash nor Schraeder had the power to make the contract sued on, and that Duval was equally powerless to so ratify it as to bind the appellant. The court, however, as already indicated, properly excluded them from the jury. These articles of association would have been altogether proper had the controversy been between the companies, or the officers of the companies, composing the association, and the inquiry had been as to the rights and powers of the members of the association or its officers. But that was not the case. The public do not and are not supposed to know anything about the rules and regulations defining the powers and prescribing the duties of such an association, and consequently it would be highly unjust to hold those

dealing with it responsible for any infraction of its rules and regulations by its own members or agents. The business of the defendant association seems to be conducted by the general managers of the railway companies composing it, and such agents and subordinate officers as they may appoint or are provided for under their articles of association. These companies thus associated together are in their business relations to the public much like a partnership, and many of the general principles that apply to one are equally applicable to the other. As in the case of a partnership, so long as one of these companies acts within the general scope of its powers in making contracts, or performing other acts on behalf of the association, the association itself will be bound, although the particular company acting for it has exceeded its authority, as tested by its by-laws or articles of association. It is manifest the public could not safely do business with it on any other principle.

With respect to the instructions little need be said. The exceptions taken to the two given on behalf of appellees raise a question we have already discussed, namely, the validity of the contract upon which the action is brought. If the declaration discloses a good cause of action,—and we are of opinion it does,—then there was no error in giving plaintiffs' instructions, for, in effect, they merely told the jury that if they found the facts as charged in the declaration, they should find for the plaintiffs. In short, we are of opinion appellant has no just cause to complain of the rulings of the court in the giving, refusing or modification of instructions.

The judgment will be affirmed.

*Judgment affirmed.*